## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| GREG MCCLURE, THOMAS MCCLURE, PHIL PIERCE, JONATHAN AMEIGH, and CRAIG TRUDE<br><br>Plaintiffs,<br><br>v.<br><br>POLARIS INDUSTRIES, INC.,<br><br>Defendant. | Case No. _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Greg McClure, Thomas McClure, Phil Pierce, Jonathan Ameigh, and Craig Trude hereby file suit against the Defendant listed above and allege the following:

## INTRODUCTION

1.      Plaintiffs purchased new Polaris Sportsman four-wheel all-terrain vehicles (ATVs) built between 2009 and 2016. These off-road vehicles cost approximately between $6,000-$13,000.

2.      The Polaris Sportsman ATVs have a common design defect that makes them dangerous to ride. Extremely high temperature exhaust exits the engine and enters the exhaust pipe that is routed directly next to the right leg of the Sportsman rider under a thin plastic cover. Then, the burning hot exhaust pipe proceeds to the rear on the right side of the Sportsman directly underneath the rider's seat. The exhaust then proceeds through an exhaust pipe towards the right rear tire. The exhaust pipe gets so hot that components of the Sportsman can melt, including, but not limited to, side covers, seat, seat base, right-rear

fender, and right foot well. Heat from the exhaust pipe also transfers to surrounding plastic and metal components which are designed to come in direct contact with the rider. As a result, Sportsman riders are directly exposed to temperatures up to nearly 250 °F and can sustain/have sustained burns to their right leg.

3. All Plaintiffs here suffered not only from exposure to excess heat but discomfort, burns, or damage to their ATVs.

4. Polaris has known about the exhaust heat defect for years. If presented within the six-month warranty, Polaris dealers may replace melted components like seats or fenders. Polaris otherwise refuses to repair the defect. Polaris has publicly stated to the Consumer Product Safety Commission that the heat and melting problems is due to how the rider uses the Sportsman and denies a design defect. However, many users posted information contradicting Polaris excuses, including posts on the Consumer Product Safety Commission's websites, Polaris' own ATV forum, and the Better Business Bureau. Polaris knew of these posts, and minimized the exhaust heat defect, claiming it was a rider usage error. Meanwhile, Polaris had extensive knowledge from in its own internal testing, customer complaints, and warranty data that there was an exhaust heat defect impacting the ATVs. In fact, from 2014 to 2017, Polaris was secretly negotiating with the CPSC to come up with solutions and demanding the CPSC not reveal any of Polaris' data.

5. In March of 2017, Polaris issued a recall for some of the Sportsman ATVs. Then in August of 2017, it provided a service advisory for some others.[1]

---

[1] *See* http://www.polaris.com/en-us/company/article/polaris-recalls-sportsman-850-and-1000-atv-due-to-burn-and-fire-hazards, last accessed on June 27, 2017.

6.      Polaris hid the exhaust heat defect from Sportsman purchasers at the point of sale that would have impacted purchase decisions and purchase price. Polaris' omissions artificially inflated the market price for the ATVs. Polaris could have and should have warned customers about the exhaust heat defect on its website, in its product brochures (available online and at Polaris dealerships), and through communications from its authorized dealers. However, Polaris failed to do so.

7.      The Sportsman ATVs exhaust heat defect releases exhaust gas at temperatures above Polaris's own internal standards, premised upon touchpoint standards for burns and pain. Further, it presents a safety risk to riders, causes damage to components over time, and makes the ATV dangerous and uncomfortable to ride. Rather than inform prospective purchasers of the defect, Polaris deliberately hid the defect it possessed superior information about. As such, Polaris' conduct constitutes a violation of the consumer protection laws of Minnesota or New York, fraudulent concealment under either state's laws, and an unjust enrichment. Plaintiff seek reimbursement for the amount they overpaid for the defective ATVs, money for pain and suffering, attorneys' fees, and punitive damages.

## PARTIES

8.      Greg McClure is a citizen of New York, and a resident of Orange County. He purchased new from a Polaris dealer a 2016 Sportsman 850.

9.      Thomas McClure is a citizen of New York and a resident of Ulster County. He purchased new from a Polaris dealer a 2015 Sportsman 570.

10.     Phil Pierce is a citizen of New York and a resident of Ontario County. He purchased new from a Polaris dealer a 2016 Sportsman 450 HO.

11.     Jonathan Ameigh is a citizen of North Carolina. At the time of his purchase of a 2014 Sportsman 850 XP he was a resident of Steuben County, New York.

12.     Craig Trude is a citizen of New York and a resident of Oswego County. He purchased new from a Polaris dealer a 2016 Sportsman 570.

13.     Defendant Polaris Industries Inc., ("Polaris") is a citizen and resident of Minnesota which regularly does business in the Minnesota and all over the United States. Polaris is headquartered at 2100 Highway 55, Medina, MN 55340.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction for this case pursuant to 28 U.S.C. § 1332(d), as it is a diversity action for damages that exceeds $100,000, inclusive of damages, attorneys' fees and punitive damages. Plaintiffs are residents of different states than Defendant, who is incorporated and/or headquartered in Minnesota.

15.     This Court has personal jurisdiction over Defendant because of its continuous and systematic business contacts with the State of Minnesota, the fact that Polaris maintains over a dozen authorized dealers in Minnesota, is headquartered in Minnesota, and derives substantial revenue from sales of its products in Minnesota, with knowledge that its products are being marketed and sold for use in this State.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

# FACTUAL ALLEGATIONS

**A.      Polaris Designed, Tested, and Marketed a Defective ATV**

17.      Polaris is a manufacturer of boats, snow-mobiles and recreational all-terrain vehicles. Polaris has 1800 dealers in North America and sold 390,000 ATVs in 2015. Polaris had $4.7 billion in sales in 2015, with a gross profit of $1.3 billion, and net profit of $455 million.

18.      Polaris Sportsman include single-engine quadricycles (the 450s/570s) and larger twin-engine ATVs including the 850/1000 models.

19.      Polaris designed the Sportsman to locate the exhaust pipe coming from the engine directly next to the rider. Extremely hot exhaust exits the engine and enters the exhaust pipe located directly next to the right leg of the Sportsman rider, under a thin plastic cover. Then, the burning hot exhaust pipe proceeds to the rear on the right side of the Sportsman directly under the rider's seat. The exhaust then proceeds through an exhaust pipe towards the right rear tire.

20.      The following photograph was taken with an infrared temperature gauge that showed temperatures of nearly 250 °F on the back panel that contacts the rider's right leg. That temperature was reached at idling speed; temperatures are likely to be far higher during use.



21. For perspective, when a hot water heater is installed in a house, the thermostat is required to be set no higher than 125 °F.

22. The 250 °F temp is hot enough to melt the seat of the ATV and the plastic cover of the right back wheel fender, as shown in the following photo:



### B. Polaris Knowingly Sold ATVs that Violated its Own Temperature Specifications and Could Burn Riders or Melt

#### 1. Polaris Developed Touchpoints for Safety and Comfort

23. From at least 2003, Polaris engineers collected data on touchpoints (the temperatures at which riders would suffer burns or discomfort from touching hot ATV components) and heat deflection points (the temperatures at which the components would deform from the heat).

24. Bryce Evans, Polaris' ATV Quality Project Leader, conducted his own testing and literature review, and based upon his research and customer relations, concluded 115°F the appropriate temperature at which riders may experience pain from the heat.[2] Evans shared this information with senior executives – such as former Director of Engineering Robin Stroot, during this time.[3]

25. An International Standard Organization article set 140°F as the burn threshold for human contact of less than ten seconds with plastic, with increased exposure lowering the temperature threshold to 118°F at 10 minutes.[4] ███████████████

████████████████████████████████████████████████████████████

---

[2] *See Johannessohn et al, v. Polaris Indus. Inc.,* 16-cv-3348-NEB-LIB, ECF No 339-4 (Dep. of Bryce Evans) at 94:24-102:8; 114:24-115:3. Plaintiffs' Counsel has extensively litigated and survived summary judgment against Polaris in the aforementioned case. All ECF references made herein are to the *Johannessohn* docket. Plaintiffs will cite to public filings where possible and seal those portions consistent with prior orders.
[3] *Id*. at 129:25-131:1.
[4] ECF No. 336-8 (ISO-1372 - Ergonomics of the thermal environment – Methods for the assessment of human responses to contact with surfaces) at 9.

7

26.     The Polaris test procedure ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[5]

2. *Polaris Sold Defective ATVs That Violated its Own Temperature*
   *Standards*

27.     While Polaris properly developed testing procedures and heat specs, it improperly developed the Class Vehicles. Polaris crammed larger engines with higher exhaust gas temperatures (EGTs) into existing frames.[6] This meant too little clearance between the hot exhaust manifold and the rider or the plastic components contacting riders.[7] This resulted in burns, discomfort.

28.     Polaris itself noted the potential melting risks in its design in 2016 when conversing with the CPSC:[8]

---

[5] ECF No. 337-2 at 5, 11.
[6] ECF No. 337-3, Dep. of J. Fields Dep. at 260:24-263:11 ███████████████
████████████████████████████████████████████; ECF No. 337-4 at 6 ███████
███████████████████
[7] Fields Dep. at 276:22-280:13; 281:21-282:22.
[8] ECF No. 336-9.





29. Polaris learned of the extent of the ATV exhaust heat defect through multiple sources, including incident reports, product testing, and customer complaints.

a) Incident Reports Showed the Heat Defect.

30. For example, IRs ("incident reports") are created when Polaris test riders find that a product failed an internal Polaris standard.[9] Since at least 2007, Polaris employees have repeatedly created IRs regarding heat issues on Sportsman ATVs.[10] In February of 2014, test riders on the 570 repeatedly noted excessive heat on the rider's right leg, opening an IR (13633) titled "Excess exhaust heat Sportsman 570."[11] Jesse Santi (a Senior Project Leader on ATVs) tried to close the investigation in August of 2014, promising to fix the heat problem in future model years. Another engineer, Tom Kadlum, emailed his objection:[12]



> 13633 — excess exhaust heat Sportsman 570
> No way to close this one on a promise to fix this one in MY16. Drivers were commenting on the excess heat on these units in the spring of 2013 when it was 50 degrees out. Both production check drivers just commented on it on the new PC units and it's not even hot out. If it is closed there will be no place to track the non-stop comments about it, pretty sure if it is closed it won't get the attention it needs. I think we need to be working on a running change for the MY15's. We are already sending out a field fix on a related excess seat base heat, we need to fix it. Until we have a fix, it will stay — Jesse Santi

---

[9] ECF No. 339-13, Stroot 8/23/18 Dep. at 26:7-19; 48:22-49:1.
[10] ECF No. 336-10 (Dec. 10, 2007 IR 4792 -"Seat is Melting").
[11] ECF No. 336-11 at 1. ECF No. 339-14, Dep. of Jesse Santi at 59:2-50:1-8.
[12] ECF No. 336-12.

31.     The IR did remain open–but without resolution.[13] In 2016, Jason Fields, a Thermal Team manager for ATVs, suggested increasing the clearance on the side panel of the 570's to reduce heat on an operator's leg, but was ignored.[14] As late as October 2017, a rider study noted that the "█████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████"[15]

32.     A similar scene repeated itself a year later as to the 850/1000 models. In February 2015, Polaris test riders opened IR 15576 ("Heat shield melting too hot to touch Sportsman XP").[16] Again, it was assigned to Santi, who tried to close it with a promise to redesign later models: "a new RH side panel to give more heat deflection as well as more distance between heat source and side panel."[17] Again, another Polaris objected about kicking a fix down the road, and even noted a similar IR that had gone neglected: [18]

---

[13] Santi confirmed the units complained about in the IRs were production check units available on the market; that Kadlub was embarrassed that unresolved IRs were being closed; and that no resolution to the IR13633 occurred until 2017. ECF No. 339-14, Santi Dep. at 61:19-62:10; 67:1-71:24; 74:1-77:19; 79:21-80:7; 83:12-86:6, 102:1-7.

[14] ECF No. 337-3, Fields Dep. at 207:1-210:13.

[15] ECF No. 337-5, PX138 (ATV Rider Heat Study) at 2-5.

[16] ECF No. 336-13. Sportsman XP refers to the 850 and 1000 models.

[17] *Id*.

[18] ECF No. 336-14. *(emphasis added)*.

> heat shield melting too hot to touch Sportsman XP —The problem was the plastic was too close to the exhaust in 2011 (see IR below), it is 2015 and we have the exact same problem with the exact same promised fix. It appears we want to implement the promised fix from the 2011 IR in MY17? What about an interim fix while we wait for the same Countermeasure from the 2011 IR to be implemented? It needs to be addressed now.

33. The 2011 IR was IR9578 "Cabs melting on exhaust side Sportsman 850."[19]

34. The right-side exhaust manifold and side covers had not changed on the 850 since 2009.[20]

35. Polaris did not redesign the 850/1000s until MY17.[21] Santi conceded that the proposed MY17 redesign could not help MY15 and MY16 purchasers.[22]

> b) Product Testing Revealed Melting and Excess Heat and that Polaris Could Not Meet its Own Touchpoint Standards

36. Since at least 2013, Polaris engineers expressed concerns about "body plastic heat" on its ATVs.[23]

37. In September of 2015, Polaris Engineer Jonathan DeKay reviewed 570 models to select temperature specifications for MY16 models under development.[24] He found 570 models with melted rear cab assemblies and side panels and temperatures above specs.[25] He consulted with Nathan Dahl (a Program Manager for ATVs), Santi, Evans, and

---

[19] ECF No. 336-15. "Cabs" refers to rear cab assemblies.
[20] ECF No. 339-6 (Jordan Rebuttal Report at ¶¶ 38); ECF No. 339-7 (Dep. of Breen) at 42:18-25:25; 46:10-49:15.
[21] Santi Dep. at 146:23-147:24.
[22] *Id.* at 140:7-144:11.
[23] ECF No. 336-16.
[24] ECF No. 339-11, DeKay Dep. at 71:1-22.
[25] *Id.* at 75:16-77:4; ECF No. 339-29 at 4, 8, 9. *See also* DeKay Dep. at 110:22-111:8 (DeKay noting severely melted side panels on 850s and 1000s as of June 2016).

Fields.[26] ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████[27]

38.     However, a March 2016 test report still showed temperatures exceeding Polaris specifications.[28]

> c)    Customer Complaints About the ATVs Were Minimized, or Quietly Resolved to Avoid Disclosure

39.     For years, Polaris received customers complaints about excess heat and product melting on the ATVs.

40.     For example, dealers in Minnesota noted melting seats and high temperatures, but were told forthcoming shielding would resolve the problem.[29]

41.      Joseph Yechout (then a Polaris service engineer) discussed complaints of excessively hot ATVs and product melting as part of Early Warning Meetings with engineers.[30] Polaris would provide seat replacement kits to complaining customers and not publicly disclose the problem.[31]

42.     If a customer posted complaints on the CPSC website, Polaris would minimize them as rider error or related to heavy loading and high ambient temperature.[32]

---

[26] *Id.* at 85:21-86:6, 88:20-89:25.
[27] *Id.* at 90:1-91:17; ECF No. 339-29 at 10-12.
[28] ECF No. 339-15 at 7-9; ECF No. 337-3, Fields Dep. at 219:10-220:25; 231:1-235:22.
[29] ECF No. 336-17; Tab 5, ECF No. 339-5 (Dep. of Dawson) at 41:15-41:25; 42:25-44:21; 46:23-48:15.
[30] ECF No. 339-3 (Dep. of Joe Yechout) at 61:19-24; 137:11-138:6; *see also* ECF No. 336-18 (May 2014 email chain regarding melting seats on 570s);
[31] Yechout Dep. at 101:4-10.
[32] ECF No. 336-19 at 9-11.

43.     Later, Yechout wrote that Polaris could not "wait any longer to start exploring other options," as he was "receiving reports from dealers who claim to have multiple units" melting.[33]

44.     Complaints on the larger ATVs were also piling up. Customer surveys that included metrics like Net Promoter Scores (NPS) highlighted melting plastic on the 850s as a negative as far back as 2012.[34]

45.     A January 2015 customer survey found that the biggest detractor for the Sportsman 1000 was "heat."[35]

46.     Defendant numerous public complaints regarding the exhaust temperature causing damage over the years to the fender, the seat, and even burning riders.[36] Some of these complaints from consumers (and their date of posting) include:

**Derek of Liberty, TX on Sept. 22, 2014**
Polaris 800 utv and 570 atv - My friend and I both had 2008/2009 500 rangers. Both very good machines. In 2012 we traded them in for the 800xp camo versions. Mine has 70 hrs, his has about 150hrs. To start with, these things will burn your ** up. The seats get so hot you can feel the plastic weakening under you on the pass side. The heat has ruined both of our seats. Not covered by warranty even though we both have extended coverage. Spoke to dealer. They say the problem is with the EPA, nothing they can do to fix it. The driver's gas foot will cook on an extended ride, 30 minutes or so.

---

[33] ECF No. 339-16 (570 Head Issues Timeline 8/14-5/15) at 3

[34] ECF No. 337-6 (noting the Net Promoter Score for MY12 850 at only 63%, with "Comments: BACKFIRING, MELTING PLASTIC."). *See also* ECF No. 339-2 (Dep. of N. Dahl) at 33:21-34:4; ECF No. 337-7 (showing a 5% NPS drop due to "570 model: Heat."); ECF No. 337-8 (Sept. 2016 slides showing negative results of early buyer survey and NPS data as to heat).

[35] ECF No. 339-17 (MY15 ATV NPS Update – through 12/31/14) at 2.

[36] http://atvconnection.com/forums/polaris/326311-hot-leg-08-800-sportsmans.html, last accessed September 25, 2016.

Both of our units are used on the farm. Neither are abused or driven hard. An employee of mine purchased his first 4 wheeler, a 570 on Saturday 9-20-14. At less than 25 miles, his seat is melted, dash display has quit and gas is boiling in tank when it gets to 1/2 tank. It pulls hard to one side and vibrates badly at 30 mph. Polaris products have gone severely downhill. That's 30k in junk products. Do not buy Polaris!!!

**Jerry of Stoneham, MA on July 8, 2014**
I have a brand new 2014 Sportsman 570 with EPS. I love the looks, speed, ride and handling of my new machine. However, after about ten hours the machine was running so hot it actually burnt the inside and back of my leg. It also melted the bottom of the seat so it doesn't align properly anymore. I complained to Polaris but of course nobody contacted me.

**Samantha of Bouctouche, NB on June 11, 2015**
I bought my 2014 Polaris 850 in October 2014. Now here it is June 2015. I took my bike in for service cause one day we were out riding and we noticed our plastic on the right side started to bubble and it had melted my husband's boot! Now that being said that is not normal for a brand new bike to heat up that much. We had heard that it is our fuel pump burning to rich? Odd and I only had warranty for 6 months! And this is going to cost us $220. For just the fuel pump! And god knows how much in labour. So in all I will not be buying another Polaris anymore! I'm not impressed.

47.     In a September 2, 2016 complaint to the Better Business Bureau, Polaris was

notified about the heat and melting issue, but did provide a trade-in credit that accounted

for the defect, and permitted the purchasers to buy an ATV with a different design:

Complaint: On March 30, 2016, my husband and I decided to purchase a very nice 2015 Polaris Sportsman 1000. Keep in mind all in all after finance charges and taxes, we will be paying exactly $13,298.40. We had a six month warranty on this vehicle meaning ANYTHING that goes wrong will be FIXED at no cost. My husband treated this four-wheeler like his baby, he washed it everyday and everyone told him he needed to treat it like a four-wheeler, they thought he was crazy for spending that amount of money for something he wouldn't even let get dirty. okay, with that being said, fast forward to June 29, 2016, the exhaust was glowing red and getting so hot that it melted through the back plastic where the passengers leg would be. The dealer we bought it from was called and they told us to bring it up there. we had already asked a week ago if the exhaust was supposed to glow and they told us that it was normal so we thought nothing of it. Once it burnt through

the plastic, they told us that it was not supposed to be hot enough glow and definitely not hot enough to burn through the plastic. With this being said we left it there to be fixed and we kept calling once we realized that we had been without our four-wheeler for over a month! They kept telling us they had to check the fuel to air ratio and that once they had a response from Headquarters they would be able to fix it.

Finally we got a call on August 15, 2016 that our four-wheeler had been fixed and we could come and pick it up. Upon arrival, we were told that the four-wheeler had been swamped and that was the reason for it being so hot. We knew that was not what happened it had never been in mud but we just took it and left. It was supposed to be fixed and now it is still running hot and we are unable to ride it. we are now being told that others are doing the same thing but it is "not a recall" and they don't know how to fix it. we were told to ride it as fast as we feel comfortable riding it to keep airflow. It's a safety hazard and it's going to cause harm

Desired Settlement: We were offered a $7500 trade in on it which is insane being for one the out the door price was $10,665.00 and we still owe $10,065.00 on it and then some for interest which makes it closer to $12,000. We would like to either have a 100% refund or we would like to get in return something of EQUAL value that will not be a danger to our family. We do not mind making our payments, but we do not want to have to pay the difference for something else. especially since it's a manufacturing problem.

Business Response: Polaris spoke to consumer on Case # C-*******. Consumer was working with Chris. Consumer has been advised that he would have the conversation of trade in assistance but the consumer never called back. If the consumer would like to have this discussion with Chris please call ###-###-#### and reference case # C-******. There is no guarantee anything will be offered but the conversation was offered once the consumer spoke to the dealer about the trade in value.

Consumer Response: Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID ********, and find that this resolution is satisfactory to me. Polaris Industries, Adrenalin Power sports, and I have been discussing our options on the phone and have been coming to a mutual agreement throughout the last couple of days and I am going to trade the four-wheeler in at a higher trade in value and they are working with me on payments and for something that works like it is supposed to and something my husband and I both are satisfied with. We appreciate all the help. We accept all the decisions as long as they go as we have discussed. That we will receive $7500.00 for trade in

with an additional $1500.00 and then we are able to get the discount of $700.00 on the RZR 900 S. Thanks to Chris from Polaris and Dillon from Adrenalin we should be getting a very nice product.[37]

48.     Complaints such as these are not only on consumer complaint websites.

Threads about them can be found on Polaris' own ATV forums.[38]



49.     Customers have even taken to trying to wrap the exhaust system themselves

to protect them from the burning exhaust.[39]

---

[37]     http://www.polarisatvforums.com/forums/polaris-sportsman-570/55527-found-new-problem-570-exhaust-melting-seat.html, last accessed October 3, 2016.

[38]     *See, e.g.,* http://www.polarisatvforums.com/forums/polaris-sportsman-570/55527-found-new-problem-570-exhaust-melting-seat.html, last accessed September 26, 2016.

[39] *See, e.g.*, https://www.youtube.com/watch?v=B2qWHeU2Q3E and https://www.youtube.com/watch?v=F57JvSeh-jE, last accessed on September 25, 2016.

50.    Customers have also complained to the Consumer Product Safety Commission. One such complainant noted the melting and safety risks:

> I own a 2014 Polaris Sportsman 570 ATV with power steering. I have about 10 hours on the machine and about 70 miles. Within the first couple hours of riding I noticed that the seat was no longer aligning properly while riding. I thought it was odd but kept on riding. After the day I riding I did some reading on the Polaris ATV online forums and read of the excessive heat and melting seat problems. I removed the seat and notices the plastic seat bottom was severely melted. The nest time I went on a four hour ride and again while riding the seat was misaligned and I could feel the incredible heat the machines engine was producing. Throughout the day I was unaware the my leg was actually burning on my right side ankle due to the amount of heat. I didn't realize the leg burning until the end of the day once we got back to the house and I removed my socks to get ready for bed. I had heat and burn blisters on my ankle. I am a paraplegic and in a wheelchair and I can't feel my legs from the knees down therefore I never knew I was getting burnt. At this point after spending all my money on my new ATV I am afraid to ride it and get burnt again and I am afraid the seat may even catch on fire.[40]

51.    On October 1, 2014, Polaris responded, disregarding the safety issues of exhaust problem and blaming the rider – a paraplegic – for making the purchase:

> Polaris has been in contact with the consumer regarding this issue and has asked the consumer to contact his dealership so that the vehicle could be properly inspected and repaired if necessary. The consumer has indicated they have a physical disability (paraplegic) that does not allow normal awareness or feeling when exposed to elevated temperatures. Polaris' owner's manual for Owner's Manual for Maintenance and Safety warns that no one with cognitive or physical disabilities should operate this vehicle. Polaris recommends that the consumer pursues the appropriate safety considerations for his unique circumstances.

52.    Polaris acknowledged awareness of the melting seat and exhaust issues, but claims it is due to rider usage and not a design defect:

> Polaris has received reports of some Sportsman 570's experiencing localized deformation, and in some instances, melting of the right side lower seat base

---

[40] http://www.saferproducts.gov/ViewIncident/1418847, last accessed October 3, 2016.

supports. Polaris' review of the issue has found that some vehicles being used in extreme operating conditions (i.e. high ambient temperatures and under high loads) may be more susceptible to the issue. Although only a small percentage of the vehicles in service have been affected, Polaris has developed a seat retention kit to address these concerns on those vehicles affected by this issue and one of these kits has been installed on this vehicle. Polaris' records indicate that the consumer has been in contact with his dealer and that steps are being taken to attempt to address the consumer's complaint. Polaris believes this is a customer satisfaction issue and is not an issue that reasonably supports a conclusion that the product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of death or serious injury.

## C. Polaris Hid the CPSC Investigation and Information from the CPSC

53. While Polaris engineers dithered about the heat defect, the CPSC opened an investigation in August of 2014. The CPSC requested Polaris provide information regarding heat-related complaints in Polaris vehicles, including Sportsman ATV's.[41]

54. Polaris had been effectively doing a "silent recall" providing a seat upgrade kit to tamp down criticisms and would dismiss complaints of melting ATVs on the CPSC website as aberrations.[42]

55. As the investigation progressed, Polaris took the position that while there were heat and melting problems with the 570s, they were merely customer dissatisfaction matters rather than a substantial product hazard.[43]

56. By February of 2016, the Polaris Board of Directors knew the it was going to have to do more:

---

[41] ECF No. 337-9 (CPSC Letter 8/07/14) at 1.
[42] ECF No. 336-21 at 4-9.
[43] ECF No. 336-22 at 23; ECF No. 336-21 at 4.

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████[44]

57.     Polaris finally disclosed to the CPSC the melting/fire/burn cases regarding the 850/1000 models in a confidential letter in September of 2016. Polaris admitted that the RH side panel heat shield was "in close proximity to, and in some cases makes contact with the exhaust manifold" and "can pose a burn or fire hazard."[45]

58.     The language in the CPSC finding mirrored the language from IR15576 from September of *2015*: "RH side panel is sitting too close to the head pipes on both 850/1000s, this is causing excessive heat, along with possible plastic deformation."[46]

59.     In March of 2017, the CPSC made a preliminary finding that the MY15-MY16 850/1000s presented a "substantial product hazard" adopting the same language Polaris used in its September 2016 letter.[47]

60.     Polaris agreed to a product recall for the 850/1000s that provided additional fiber foil adhesive heat shields, and new plastic and metal shields.[48] The recall notice conceded, "Polaris has received at least 793 incidents, including reports of warped, melted

---

[44] ECF No. 337-10 (BOD Thermal Update - 2/29/16) at 3.
[45] ECF No. 336-7 at 2.
[46] ECF No. 336-13 at 1.
[47] ECF No. 336-23 at 1. A "substantial product hazard" is one where "a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a).
[48] See http://www.polaris.com/en-us/company/article/polaris-recalls-sportsman-850-and-1000-atv-due-to-burn-and-fire-hazards, last accessed June 28, 2017.

or burned side panels, 47 fires and four minor burn injuries." This recall only affected about 19,200 ATVs.

61.     Polaris convinced the CPSC not to do a recall on the 450/570s, and to do a voluntary "service advisory" offering purchasers a free "right hand side close off kit."[49]

62.     Before the 2017 actions, Polaris repeatedly demanded that the CPSC keep its investigation confidential.[50]

63.     Meanwhile, Polaris continued to push its employees to conceal the future recall from dealers. In December 2016, Neil Kluempke, a service engineer at Polaris, wrote, "With this, do not make any mention of any future field campaign/recall campaign, not one word!"[51]

## D.     Polaris Concealed From the CPSC and Customers that the Fixes Fail

64.     Polaris misconduct did not end with the public recall. It has continued to deceive the CPSC and its customers.

65.     For example, in February of 2016, a Polaris test rider on a Sportsman 570 logged that he "received 2nd degree burned (sic) through my ride pant leg on the inner side of right lower leg [.]"[52]

---

[49] ECF No. 336-26.
[50] ECF No. 336-22 at 12; ECF No. 336-19 at 15; ECF No. 339-9 (Dep. of R. Bigot) at 87:8-88:12, 90:7-17, 93:25-102:23; 201:21-204:5, 292:1-293:22.
[51] ECF No. 336-28 (2015-2016 Sportsman 850 1000 Side Panel Service Parts Update – 12/08/16).
[52] ECF No. 339-18 (IR202013 "Exhaust Heat on Driver's Leg Sportsman 570 6X6") at 2.

66. Polaris did not provide this report to the CPSC. In fact, in a November 2016 report about the 570, Polaris told the CPSC that "[it] is not aware of any rider that has experienced a burn injury while wearing appropriate personal protective equipment."[53]

67. In October 2016, Polaris began testing its 850/1000 recall kit and the close-off kit that would become the 450/570 service advisory.[54] Director of Engineering Rob Stroot devised a "█████████████████████████," and suspected that "█████████████ █████████████████████████████████████████████"[55]

68. Stroot wrote in December 2016 that, "██████████████████████████ ████████████" and suspected that the proposed changes to the "█████████████ ██████████████████"[56]

69. Nevertheless, Polaris' solution was to add adhesive foil shields, side panels and shields with new materials.[57]

70. Testing done in January of 2017 with the recall kits showed the ATVs still had some melting issues, and temperatures above the touchpoint and deflection specifications.[58]

---

[53] ECF No. 336-18 at 6.
[54] ECF No 339-11, DeKay Dep. at 140:16-142:16.
[55] ECF No. 339-19.
[56] ECF No. 337-11 at 1.
[57] ECF No. 339-10, Stroot 30b6 Dep. at 226:13-229:24.
[58] ECF No. 339-20 (Off-Road Test Request 42602) at 3; ECF No. 337-12(850 Trail PowerPoint) at 10, 22, 23, 24, 30, 37, 41, 43; ECF No. 339-21 (Email re Sportsman XP AZ Recall Kit Testing - 1/16/17); ECF No. 339-23 (Cover Email and Sportsman XP Heat Comparison PowerPoint); ECF No. 339-11, DeKay Dep. at 211:17-214:4.

71.     The CPSC asked Polaris to provide some "A/B" testing (i.e., with and without the recall kits), and DeKay volunteered to put together the presentation.[59]

72.     DeKay's presentations showed high temperatures even after the kit was employed. However, Stroot removed slides showing these higher temperatures before providing it to the CPSC.[60]

73.     After employing the recall kit, Polaris learned that the fiber foil shields could lose adhesiveness and flake off.[61]

74.     Polaris also did not inform the CPSC about this, nor the customers who received the recall kits.

75.     The optional close-off kit also has shortcomings. Testing in the fall of 2016 showed that by blocking the exit point for heat at the right footwell *increased* temperatures on the left side and under the seat.[62]

76.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████[63]

77.     Polaris has still not shared this information with the CPSC or its customers.

[59] ECF No. 336-30; DeKay Dep. at 193:6-195:14.

[60] ECF No. 339-22; ECF No. 339-23; ECF No. 339-11, DeKay Dep. at 194:16-195:17, 217:7-221:7, ECF No. 339-13, Stroot 8/23/18 Dep. at 256:20-266:7.

[61] ECF No. 336-31 (Email re A-17-01 Seat Foil); ECF No. 339-13, Stroot 8/23/18 Dep. 205:17-207:4.

[62] ECF No. 339-11, DeKay Dep. at 138:3-21; ECF No. 339-24 (Copy of Heat Test Generator for testing of MY17 570)

[63] ECF No. 337-13 at 11, 15; ECF No. 337-3, Fields Dep. at 276:22-280:13; 281:21-282:22.

78.     The inadequacy of the recall and close-off kits was confirmed by Plaintiffs'

expert, Dr. Colin Jordan.[64] Dr. Jordan tested three representative ATVs and found they

exceeded the temperature criteria in Polaris' own standards after Polaris' service advisory

and recall kit were applied.[65] Dr. Jordan also analyzed the ATVs and found that they have

a common design for thermal management.[66]

### E.     Polaris Marketing Did Not Disclose Exhaust Heat Defect

79.     Each of the Sportsman ATVs come with an Owner's Manual. The manual

warns:

> Hot Exhaust Systems: Exhaust system components are very hot during and
> after use of the vehicle. Hot components can cause burns and fire. Do not
> touch hot exhaust system components. Always keep combustible materials
> away from the exhaust system. Use caution when traveling through tall grass,
> especially dry grass.[67]

The manual says nothing about the exhaust heat exceeding Polaris' own internal standards,

and that the pipe may get so hot as to melt components or burn the rider even when operated

as intended due to its design.

80.     The manual also has within it an express warranty. The warranty repeatedly

disclaims coverage for design defects.[68] The warranty does not disclaim the implied

---

[64] ECF No. 339-25, Jordan Report, at ¶ 7. Dr. Jordan has a Ph.D. in mechanical engineering,
has taught courses in mechanical engineering, and worked as a consultant for Ford in heat
management.
[65] *Id.* ¶ 18.
[66] *Id.* ¶ 9.
[67] 2016 Sportsman Owner's Manual at 24.
[68] 2016 Sportsman Owner's Manual at 152.

warranty of merchantability, but instead limits the warranty's duration to the same short six-month period stated in the express warranty.[69]

81.     Polaris created marketing materials for the ATVs which it provided to authorized dealers. Polaris also supplies its dealers product information via a company called ARI to populate the dealer's website. Dealers are contractually obligated to market Polaris' vehicles only as Polaris prescribes.

82.     Polaris also has a product website for its Sportsman ATVs.[70] The website features information about and pictures of the Sportsman ATVs. The website is used by Polaris dealers who get information for their website from this site.

83.     The Sportsman ATVs are described in various ways, including, a) "Home to the best-selling Automatic 4x4 ATV of all time – with legendary ride and handling, the Sportsman®; b) "ATV gets you through the toughest trails and the biggest jobs."; c) "The Sportsman® is designed to withstand anything from the farm yard, to the pastures and the trail with its hardest working features."; d) "Sportsman's value-class ATVs offer features to get the toughest jobs done and legendary smooth riding when you're ready to hit the trail." In no instance did the website inform the readers about the Exhaust Heat Defect.

84.     The website also has a "find a dealer near you" search box. These authorized dealers also have information about the Sportsman ATVs, provided to them by Polaris. As detailed below, these detailers did not apprise Plaintiffs or similarly situated consumers about the Exhaust Heat Defect.

---

[69] 2016 Sportsman Owner's Manual at 154.
[70] *See, e.g.,* http://www.polaris.com/en-us/atv-quad, last accessed on July 3, 2017.

85.     The website also has some of the product brochures of Polaris products. This includes the product brochure for off-road vehicles including the Sportsman ATVs.[71] Screenshots of the brochure relevant to the Sportsman are below. The brochure discussed several attributes and aspect of the Sportsman but does not inform readers about the Exhaust Heat defect.



[71] *See, e.g.,* http://polaris.hs.llnwd.net/o40/crp/2015/documents/brochures/2014-orv-brochure.pdf., last accessed on July 3, 2017.



86.     Polaris also has YouTube channels displaying their channels in action.[72] These videos, which demonstrate products like the Sportsman in action, provide information about the Sportsman ATVs that prospective purchasers could review. The videos on the Polaris channel do not disclose any information about the Exhaust Heat Defect.

**F.     Defendant's Misconduct Caused Damage to Plaintiffs**

87.     In addition to the individual damages discussed below, Plaintiffs' damages experts have determined that the Defendant's misconduct led to an inflated market price of approximately 8.8 percent of purchase price.[73]

---

[72] *See, e.g.,* https://www.youtube.com/user/PolarisORV/search?query=sportsman, last accessed July 3, 2017.

[73] ECF No. 339-27, Damages Report of R. Eichmann (Rebuttal Report) at ¶ 31.

88.     In addition, Plaintiffs' experts have estimated the cost to retrofit the ATVs to match the design of MY18 models (for which Polaris claims they are "60% cooler with new side panels!"), at about 150.29 for a 850/1000 vehicle and $479.87 to 1324.72for a 450/570.[74]

### G.     Plaintiffs' Experiences

#### *1. Greg McClure*

89.     Greg McClure is a citizen of New York, and a resident of Orange County. He purchased a 2016 Sportsman 850 on September 9, 2016 for $10,241.69 from M&M Auto Group in Liberty, New York.

90.     Before his purchase, Mr. McClure reviewed marketing materials including a Polaris product brochure and the Polaris website. He also spoke to an employee at the dealership about the 850. Comfort was an important issue for Mr. McClure, and neither the marketing materials nor the dealer informed him about the exhaust heat defect.

91.     After his purchase, Greg McClure experienced excessive heat through the side panels and seats, making his ATV very uncomfortable to ride.

92.     Greg McClure contacted the dealership about the heat issues and was told about the recall in 2017. He took his ATV in for the 850/1000 recall. Even after the work was performed, he still experiences excessive heat that turns the exhaust pipe cherry red. He even used a heat gun to take the exhaust gas temperatures:

---

[74] ECF No. 339-25 at 24; ECF No. 339-27 at ¶¶ 34-37.





93. Had he known of the exhaust heat defect, Mr. McClure would have purchased another ATV or paid a different price.

### 2. Thomas McClure

94.    Thomas McClure purchased a 2015 Sportsman 570 on September 26, 2015 for $8,471.40 at M&M Auto Group in Liberty, New York. Before his purchase, Mr. McClure looked at brochures at the dealership, and looked online before his purchase. He also spoke to employees at the dealership, who spoke highly of the vehicle, and claimed it was the highest selling model. None of those sources disclosed the exhaust heat defect.

95.    Mr. McClure noticed the severity of the heat in April 2016 on long rides, and he finds it very uncomfortable.

96.    Mr. McClure took his ATV in for the recall kit. He recalls the original side panel was showing signs of charring. Even after the recall, he finds the exhaust gas temperatures uncomfortable. He is concerned that the ATV might wear out soon because it runs so hot and that it may catch fire.

97.    Mr. McClure would have considered another ATV or paid a different price had he known of the severity of the exhaust heat defect.

### 3. Phil Pierce

98.    Phil Pierce is a resident of Ontario County, New York. He purchased a 2016 Polaris Sportsman 450 on March 30, 2016, for approximately, $6,000 at O'Neil Sales Inc. Farmington, New York.

99.    Mr. Pierce reviewed some marketing materials before his purchase including the Polaris website and a product brochure. He spoke briefly with a Polaris dealer and asked about the ATV's reliability. None of those sources informed him of the exhaust heat defect before purchase.

100.    After his purchase, Mr. Pierce experienced uncomfortable heat on his right leg, as if it were badly sunburnt. At times, he has had to kneel while riding. He refrains from riding that ATV beyond short rides around his yard.

101.    He took his ATV in for close-off side kit after August of 2017. He has not noticed improvement.

102.    Had Mr. Pierce known about the exhaust heat defect, he would have purchased a different ATV or paid a different price.

### 4. Jonathan Ameigh

103.    Jonathan Ameigh is a current resident of Onslow County, North Carolina. On April 29, 2014 he purchased a 2014 Sportsman 850 for $8,420 at Lake Country Motorsports in Mansfield, PA. At the time, he was a citizen and resident of Steuben County, New York and intended to (and did) use his ATV at his residence in New York.

104.    At the time of his purchase, Mr. Ameigh reviewed marketing materials including the Polaris website and a product brochure. He also spoke with a salesman at the Polaris dealership. None of those sources informed him about the exhaust heat defect.

105.    Shortly after his purchase, Mr. Ameigh noticed excessive heat around the seating and right side. He later noticed the area under the seat had some melting. He suffered slight burns on his leg as a result of the exhaust heat defect.

106.    Mr. Ameigh reached out to his dealership to complain about the heat, but was told there was nothing they could do, even though his ATV was still under warranty.

107.    The dealerships suggested he purchase on a new, third-party exhaust system, which would have cost him nearly $500.00. Mr. Ameigh declined.

108.     On March 1, 2018, Mr. Ameigh sold his Sportsman 850 for $5,000 with only 57 miles on it – in pristine condition. Mr. Ameigh felt the price was below market due to the poor reputation of the 850. He then purchased a Can-Am 570 DTS.

109.     Had Mr. Ameigh been informed about the exhaust gas defect, he would not have purchased his Sportsman ATV or paid the price he did.

*5. Craig Trude*

110.     Craig Trude is a resident of Oswego County, New York. On March 13, 2015, he purchased a 2015 Polaris Sportsman 570 for $7,358.20 at Ingles Performance in Phoenix, New York.

111.     Mr. Trude viewed some marketing materials promoting the Sportsman ATVs displayed by the dealership before his purchase. He also spoke with an employee at the dealership and asked about the ATV's capabilities and whether it was safe for his children to ride – they assured him that it was safe and capable to handle Mr. Trude's needs. At no time was Mr. Trude informed of the exhaust heat defect before purchase.

112.     After his purchase, Mr. Trude experienced uncomfortable heat on his right leg. Mr. Trude's young daughter also suffered superficial burning of her leg from riding the ATV.

113.     When Mr. Trude contacted the dealership about the heat issue, the dealership brushed him off and simply said it was probably because it was a hot day.

114.     At one point when driving the ATV through water, the heat created so much steam Mr. Trude thought the engine was failing. The steam was hot enough to irritate Mr. Trude's skin.

115. Mr. Trude no longer feels it is safe for his daughter to ride the ATV and tried to sell it, but the heat issue prevented him from selling it.

116. Had Mr. Trude known about the exhaust heat defect, he would have purchased a different ATV or paid a different price.

## CAUSES OF ACTION

### COUNT 1
### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT
### MN STAT. §325F.68 et seq.[75]

117. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 116.

118. Defendant's practices were and are in violation of Minnesota's Consumer Fraud Act, Minnesota Statutes § 325F.69.

119. Defendant is a person as defined in Minnesota Statutes §325F.68, subd. 3.

120. As alleged, Defendant engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in Minnesota. Specifically, Defendant omitted material information regarding the exhaust heat defect described herein, which can melt components of the ATV and burn the rider. These are material facts of which each purchaser should have been informed before purchasing their Sportsman ATV.

121. Through its website, product brochures, and communications with its authorized dealers, Defendant could have related information about the exhaust heat defect

---

[75] Plaintiffs plead Counts 1 and 4 in the alternative depending on the final determination of the applicable choice of law.

afflicting the Sportsman ATVs to consumers before the customers made their purchase but failed to do so.

122. The fraudulent behavior occurred at Defendant's headquarters in Minnesota. That is where decisions were made, after knowledge of the exhaust heat defect, to continue to sell the Sportsman ATVs and omit material information from its website, brochures, and authorized dealers that would have reached the Plaintiffs and similarly situated buyers. Minnesota therefore has the strongest interest in policing the misconduct of one of its state's corporations, and Minnesota law should apply.

123. Defendant owed Plaintiffs a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information about the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

124. Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

125. Defendant's conduct has a nexus with traditional consumer protection concerns, as the ATVs are purchased by thousands of consumers throughout the country and in Minnesota.

126. Plaintiffs purchased their Sportsman ATVs new from Defendant's authorized dealers but did not obtain the full value of the advertised products. If Plaintiffs had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

127.     In addition, as a result of these unfair and deceptive trade practices, Plaintiffs have suffered actual injury in that they paid more for their Sportsman ATVs because Defendant's omissions artificially inflated the purchase price.

128.     As a direct result of Defendant's unlawful deceptive business practices, Plaintiffs suffered injury by lost money or property.

129.     Plaintiffs seek an award of damages for violations of Minnesota Statutes § 325F.69 pursuant to Minnesota Statutes § 8.31, subd. 3a.

130.     Plaintiffs seek an award of attorneys' fees for violations of Minnesota Statutes § 325F.68-§ 325F.69 pursuant to Minnesota Statutes § 8.31, subd. 3a. and all other relief as appropriate.

## COUNT 2
## FRAUDULENT OMISSION

131.     Plaintiffs incorporate by reference and re-allege all the allegations contained in paragraphs 1 through 116 of this Complaint.

132.     Polaris omitted material facts concerning the ATVs.

133.     As described above, Polaris knew the Exhaust Heat Defect was material, but did not share that information with potential customers like the Plaintiffs.

134.     The ATVs purchased by Plaintiffs were, in fact, defective because of the Exhaust Heat Defect, as the ATVs exceeded Polaris' own internal heat standards, and the exhaust heat caused discomfort or injury to the Plaintiffs and damage to their ATV.

135.    Polaris had a duty to disclose that these vehicles were defective given its superior information (gleaned from testing, incident reports, customer complaints, etc.), but failed to do so.

136.    Excessive exhaust gas temperatures is material as it something the usual customer would consider before making a purchase, as shown by Defendant's own surveys, Plaintiffs' expert survey, and customer postings.

137.    Plaintiffs relied on Polaris to disclose material information.

## COUNT 3
## UNJUST ENRICHMENT

138.    Plaintiffs incorporate by reference and re-allege all the allegations contained in paragraphs 1 through 116 of this Complaint.

139.    As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale of the ATVs. Although these ATVs are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

140.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects regarding known defects in the ATVs, Plaintiffs have ATVs that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

141.    Defendant has therefore been unjustly enriched due to the known defects in the ATVs through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs.

142.   As a result of the Defendant's unjust enrichment, Plaintiffs have suffered damages.

## COUNT 4
## VIOLATION OF NEW YORK GENERAL BUS. LAW § 349, et seq.

143.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 116 of this Complaint.

144.   Plaintiffs are consumers of Defendant's products and are the end users and intended beneficiaries of said products.

145.   Defendant is engaged in consumer-oriented conduct within the intended ambit of N.Y. Gen. Bus. L. § 349. ("GBL §349").

146.   Defendant's actions and/or omissions as described herein violated GBL § 349, et seq., which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

147.   The allegations set forth herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the N.Y. Gen. Bus. L. § 349.

148.   The exhaust heat defect described herein, which can melt components of the ATV and burn the rider are material facts of which each purchaser should have been informed before purchasing their Sportsman ATV.

149.   Defendant owed Plaintiffs and those similarly situated a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information about regarding the manufacture of the products, the complaints

received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

150. Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

151. Plaintiffs purchased their Sportsman ATVs new from Defendant's authorized dealers but did not obtain the full value of the advertised products. If Plaintiffs had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

152. In addition, as a result of these unfair and deceptive trade practices, Plaintiffs have suffered actual injury in that they paid more for their Sportsman ATVs because of Defendant's omissions artificially inflated the purchase price.

153. As a direct result of Defendant's unlawful deceptive business practices, Plaintiffs suffered injury by lost money or property.

154. Defendant's decision to deliberately not disclose what it knew about the Exhaust Heat Defect to customers and to the CPSC constitutes deliberate indifference and supports the awarding of punitive damages.

155. Accordingly, Plaintiffs seek compensatory and consequential damages, equitable and injunctive relief, punitive damages, costs and reasonable attorneys' fees and all other relief as appropriate.

## COUNT 5
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 P.S. § 201-1, ET SEQ.
## Plaintiff Jonathan Ameigh only[76]

156.    Plaintiff Jonathan Ameigh separately alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1, *et seq.*

157.    Plaintiff Ameigh re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 116 of this Complaint.

158.    Plaintiff Ameigh purchased his Sportsman ATV primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

159.    All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

160.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:

(a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Defendant engaged in unlawful trade practices, and unfair or deceptive acts or practices

---

[76] Based upon Mr. Ameigh's residence and ATV use, Plaintiffs contend that either Minnesota law (where the fraud occurs) or New York law (where Mr. Ameigh lived, used, and intended to use the ATV) apply as opposed to Pennsylvania law (where the dealership was located). In the alternative, and at this stage of the case, Plaintiff Ameigh also pleads his claims, including a consumer protection count, under Pennsylvania law as well.

that violated Pennsylvania CPL.

161.    Defendant participated in unfair or deceptive trade practices that violated the Pennsylvania CPL as described below and alleged throughout the Complaint.

162.    The exhaust heat defect described herein, which can melt components of the ATV and burn the rider, are material facts of which Plaintiff Ameigh should have been informed before purchasing his Sportsman ATV.

163.    Defendant owed Plaintiff Ameigh a duty to disclose the defective nature of the Sportsman ATVS, and the safety hazard they posed, because Defendant possessed exclusive and superior information regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform customers of the exhaust head defect was likely to deceive reasonable consumers.

164.    By failing to disclose the exhaust defect, by concealing the exhaust heat defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendant knowingly and intentionally misrepresented and omitted material facts in connection with the sale of Plaintiff Ameigh's Sportsman ATV.

165.    Defendant engaged in these unlawful practices with the intent that Plaintiff Ameigh rely upon such concealment, suppression or omission, in connection with the sale of his Sportsman ATV.

166. Defendant's unfair and deceptive acts or practices occurred repeatedly in the Defendant's trade or business, was capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

167. Plaintiff Ameigh reasonably relied on Defendant's misrepresentations and omissions of material facts in the purchase of his Sportsman ATV.

168. Plaintiff Ameigh purchased his Sportsman ATV new from Defendant's authorized dealer but did not obtain the full value of the advertised product. If Plaintiff Ameigh had known the true nature of Defendant's product, he would not have purchased the ATV for the price he paid.

169. In addition, as a result of these unfair and deceptive trade practices, Plaintiff Ameigh has suffered an ascertainable loss, in money or property, in that he paid more for his Sportsman ATV because Defendant's omissions artificially inflated the purchase price.

170. Defendant is liable to Plaintiff Ameigh for treble his actual damages or $100, whichever is greater, and attorneys' fee and costs under 73 P.S. § 201-9.2(a).

171. Plaintiff Ameigh is also entitled to punitive damages for Defendant's deliberate decision not to disclose what it knew about the exhaust head defect to its customers and to the CPSC. This decision constitutes malicious, wanton, willful, oppressive behavior, or exhibited a reckless indifference to the rights of others, and warrants punitive damages.

172. Accordingly, Plaintiff Ameigh seeks compensatory and consequential damages, equitable and injunctive relief, punitive damages, costs and reasonable attorneys' fees and all other relief as appropriate.

**WHEREFORE,** Plaintiffs request judgment against the Defendant as follows:

A.      Restitution of all charges paid by Plaintiffs;

B.      Disgorgement to Plaintiffs of all monies wrongfully obtained and retained by Defendant;

C.      Compensatory and actual damages in an amount according to proof at trial;

D.      Statutory damages, penalties, treble damages, as provided by law;

E.      Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

F.      Costs and fees incurred in connection with this action, including attorney's fees, expert witness fees, and other costs as provided by law;

G.      Equitable Relief;

H.      Punitive Damages;[77] and

I.      Granting such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial for all issues so triable.

---

[77] Plaintiffs recognize that a separate subsequent filing seeking punitive damages is required for those seeking such damages under Minnesota state law. Plaintiffs assert punitive damages under New York and Pennsylvania law if applicable, and will seek it later under Minnesota law if the Court finds such law applies.

DATED this 23 Day of June, 2020.

Respectfully submitted,

/s/Karen Hanson Riebel
Karen Hanson Riebel (MN Bar No. 219770)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: 612-596-4097
Facsimile: 612-339-0981
khriebel@locklaw.com

Theodore J. Leopold (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:   (561) 515-1401

Andrew N. Friedman (*pro hac vice* forthcoming)
Douglas J. McNamara (*pro hac vice* forthcoming)
Eric A. Kafka
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

Robert Gordon, Esq (*pro hac vice* forthcoming)
Steven Calamusa, Esq. (*pro hac vice* forthcoming)
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050